1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   FRIENDS OF ANIMALS,              No.  13-cv-02034 JAM-CKD

12              Plaintiff,

13      v.                            **ORDER DENYING PLAINTIFF'S MOTION
                                      FOR SUMMARY JUDGMENT AND
14   HON. SALLY JEWELL, et al,        GRANTING DEFENDANTS' CROSS-
                                      MOTION FOR SUMMARY JUDGMENT**
15              Defendants.

16

17        This matter is before the Court on Plaintiff Friends of

18   Animals' ("Plaintiff") Motion for Summary Judgment (Doc. #18) and

19   Defendants Hon. M. R. Jewell, Secretary of Interior; Dan Ashe,

20   Director of U.S. Fish and Wildlife Service; Ren Lohoefener,

21   Regional Director of Region 8 U.S. Fish and Wildlife Service; and

22   Robyn Thorson's, Regional Director of Region 1 U.S. Fish and

23   Wildlife, (collectively "Defendants'") Cross-Motion for Summary

24   Judgment and Opposition to Plaintiff's Motion for Summary

25   Judgment (Doc. #20).  Plaintiff opposes Defendants' motion (Doc.

26   #25) and Defendants replied (Doc. #26).  A hearing was held on

27   July 9, 2014.  At the hearing, the Court ordered Plaintiff to

28   file a surreply to address standing.  Plaintiff filed its brief

                                    1

on July 16, 2014 (Doc. #28).  Defendants moved to strike a

declaration attached to the surreply (Doc. #29) and Plaintiff

responded (Doc. #30).  For the reasons mentioned below, the Court

denies Plaintiff's Motion for Summary Judgment and grants

Defendants' Cross-Motion for Summary Judgment.

I.  FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

Plaintiff originally filed this action against Defendants on

September 30, 2013, alleging two causes of actions for

(1) violation of the Conventions, the Migratory Bird Treaty Act

("MBTA") and the implementing regulations, and (2) for violation

of National Environmental Policy Act ("NEPA").

The issue in this case is whether the U.S. Fish and Wildlife

Service ("FWS") can issue a scientific collecting permit to

"take" Barred Owls for the scientific research and conservation

of the Northern Spotted Owl.  "Take" means to "pursue, hunt,

shoot, wound, kill, trap, capture, or collect."  50 C.F.R.

§ 10.12.

The Northern Spotted Owl ("NSO") is one of the three

subspecies of spotted owls and are distinguished from the other

subspecies by a darker brown color and smaller white spots.

Defs.' Statement of Undisputed Facts ("DSUF"), Doc. #22, ¶ 1.

NSOs are "secretive" and mostly nocturnal.  Id. ¶ 2.  The

majority of the current NSO population is found in the Cascades

of Oregon and the Klamath Mountains in southwestern Oregon and

northwestern California.  Id. ¶ 3.  The Barred Owl ("BO") is

native to eastern North America but expanded to western North

America in the past century.  Id. ¶ 4.  BO numbers in Washington,

2

Oregon, and California have increased since its first sightings. Id.

BOs have reduced the probability of detection, site occupancy, reproduction, and survival of NSOs because BOs are adaptable, have an aggressive nature, and compete with NSOs for the same habitat and food.  Id. at ¶ 5.  In many areas, NSOs have established some level of co-existence with neighboring BO territory holders.  Pl.'s Response to DSUF, Doc. #25-3, ¶ 9.

The FWS listed NSO as threatened under the Endangered Species Act ("ESA") on June 26, 1990, primarily due to the loss and degradation of NSO preferred habitat.  Id. ¶ 8; Pl.'s Statement of Undisputed Facts ("PSUF"), Doc. #18-2, ¶ 1.  On January 15, 1992, critical habitat was designated for the NSO. Id. ¶ 10.  On July 1, 2011, FWS released a Revised Recovery Plan for the NSO ("2011 Recovery Plan").  PSUF ¶ 3.  The 2011 Recovery Plan included 33 recovery action plans to contribute to NSO's recovery, including habitation conservation and further study on the impact of BOs on NSOs.  Id. ¶ 6; Defs.' Response to PSUF, Doc. #23, ¶ 6.  In addition, the FWS identified 10 recovery actions to address the BO threat.  PSUF ¶ 9; Defs.' Response to PSUF ¶ 9.

On December 10, 2009, FWS published a notice of intent to prepare an environmental impact statement ("EIS") related to experimental removal of BOs for the conservation benefit of threatened NSOs.  PSUF ¶ 12.  On March 8, 2012, FWS issued a draft EIS ("DEIS").  Id. ¶ 16.  Notice of the Final ("FEIS") was issued on July 24, 2013.  Id. ¶ 17.  The FEIS contained 8 alternatives: a no action alternative and seven action

3

1   alternatives with varying levels of lethal removal of BOs.  Id.

2   ¶ 18.  Under the preferred alternative, FWS would authorize the

3   experimental removal of 3,603 BOs, which would be implemented for

4   four years but may be extended for a maximum of 10 years

5   depending on the data analysis.  Id. ¶ 20; Defs.' Response to

6   PSUF ¶ 20.

7        Non-lethal removal involves capturing BOs and transporting

8   them out of the study area to a permanent facility.  PSUF ¶ 21.

9   Non-lethal removal requires interested organizations to have

10  adequate facilities and resources; therefore, most BO removal

11  will be by lethal methods.  Id. ¶¶ 21-22.

12       On September 17, 2013, FWS published notice of the record of

13  decision ("ROD") selecting the preferred alternative identified

14  in the FEIS.  Id. ¶ 25.  The ROD stated that FWS will issue a

15  scientific collecting permit for the lethal and nonlethal taking

16  of BOs as required under the MBTA.  Id. ¶ 27.  FWS issued a

17  renewable scientific collecting permit to Paul Henson, the Oregon

18  State Supervisor of FWS to take 2500 BOs.  PSUF ¶ 32; Defs.'

19  Response ¶ 32.

20

21                      II.   OPINION

22       A.   Legal Standard

23            1.   Summary Judgment

24       The Federal Rules of Civil Procedure provide that "a court

25  shall grant summary judgment if the movant shows there is no

26  genuine issue of material fact and that the movant is entitled to

27  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party

28  asserting that a fact cannot be disputed must support the

4

1  assertion by citing to particular parts in the record, or by

2  showing that the materials cited do not establish the presence of

3  a genuine dispute.  Fed. R. Civ. P. 56(c)(1)(A)-(B).  The purpose

4  of summary judgment "is to isolate and dispose of factually

5  unsupported claims or defenses."  Celotex Corp. v. Catrett, 477

6  U.S. 317, 323-24 (1986).

7      The moving party bears the initial responsibility of

8  informing the district court of the basis for its motion, and

9  identifying those portions of "the pleadings, depositions,

10  answers to interrogatories, and admissions on file, together with

11  the affidavits, if any," which it believes demonstrate the

12  absence of a genuine issue of material fact.  Celotex Corp., 477

13  U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).  That burden may be

14  met by "'showing'- that is, pointing out to the district court-

15  that there is an absence of evidence to support the non moving

16  party's case."  Fairbank v. Wunderman Cato Johnson, 212 F.3d 528,

17  531 (9th Cir. 2000) (quoting Celotex Corp., 477 U.S. at 325).  If

18  the moving party meets its burden with a properly supported

19  motion, the burden shifts to the opposing party.  Id.  The

20  opposition "may not rest upon the mere allegations or denials of

21  the adverse party's pleading," but must provide affidavits or

22  other sources of evidence that "set forth specific facts showing

23  that there is a genuine issue for trial."  Devereaux v. Abbey,

24  263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P.

25  56(e)).  The adverse party must show that the fact in contention

26  is material and the issue is genuine.  Anderson v. Liberty Lobby,

27  Inc., 477 U.S. 242, 248 (1986).  A "material" fact is a fact that

28  might affect the outcome of the suit under governing law.  Id.  A

1   fact issue is "genuine" when the evidence is such that a
2   reasonable jury could return a verdict for the non-moving party.
3   Villiarmo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th
4   Cir. 2002).   However, uncorroborated and self-serving testimony
5   alone does not create a genuine issue of fact.   Id.   The Court
6   must view the facts and draw inferences in the manner most
7   favorable to the non-moving party.   Matsushita Elec. Indus. Co.
8   v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

9        The mere existence of a scintilla of evidence in support of
10  the non-moving party's position is insufficient: "There must be
11  evidence on which the jury could reasonably find for [the non-
12  moving party]."   Anderson, 477 U.S. at 252.   This Court thus
13  applies to either a defendant's or plaintiff's motion for summary
14  judgment the same standard as for a motion for directed verdict,
15  which is "whether the evidence presents a sufficient disagreement
16  to require submission to a jury or whether it is so one-sided
17  that one party must prevail as a matter of law."   Id.

18            2.   Standard of Review under APA

19       Although neither NEPA nor the MBTA authorize a private right
20  of action, plaintiffs may bring a suit under the APA for
21  violations of the MBTA or NEPA.

22       The APA  provides that a "person suffering a legal wrong
23  because of agency action, or adversely affected or aggrieved by
24  agency action within the meaning of a relevant statute, is
25  entitled to judicial relief thereof."   5 U.S.C. § 702.   The APA
26  provides that "[a]gency action made reviewable by statute and
27  final agency action for which there is no other adequate remedy
28  in a court are subject to judicial review."   5 U.S.C. § 704.

Under the APA, an agency decision will be set aside only if it is
"arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law." 5 U.S.C. § 706(s)(A). "Review under
the arbitrary and capricious standard is narrow, and the
reviewing court may not substitute its judgment for that of the
agency." Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147,
1156 (9th Cir. 2006). Rather, the Court "will reverse a decision
as arbitrary and capricious only if the agency relied on factors
Congress did not intend it to consider, has entirely failed to
consider an important aspect of the problem, or offered an
explanation 'that runs counter to the evidence before the agency
or is so implausible that it could not be ascribed to a
difference in view or the product of agency expertise.'" Id.

    B.   Evidentiary Objections

    With Plaintiff's surreply, Plaintiff submitted the affidavit
of Marguery Lee Zucker (Doc. #28-1). Defendants moved to either
strike or in the alternative for leave to file a response to
Plaintiff's new evidence (Doc. #29). Plaintiff responded to
Defendants' motion (Doc. #30), arguing that the Court may
consider the new evidence submitted with the surreply because the
opposing party had an opportunity to respond. Although
Defendants responded to the new evidence, the Court strikes the
affidavit because the Court granted Plaintiff leave to file a
surreply but did not grant leave to submit new evidence.
Accordingly, the Court will not consider the affidavit of
Marguery Lee Zucker.

    C.   Discussion

    In a footnote in their Cross-Motion for Summary Judgment

1  (Doc. #21), Defendants argue that Plaintiff failed to submit any

2  declarations to show it has standing and therefore, the Court

3  lacks jurisdiction.  Defs.' Cross-MSJ at 3 n. 1.  In their

4  opposition, Plaintiff argues that it does have standing and

5  submitted two declarations as evidence.  Because Plaintiff is an

6  organization, either organizational standing or independent

7  standing may apply.

8

9         1.   Organizational Standing

10      An organization has standing to bring suit on behalf of its

11  members when "(a) its members would otherwise have standing to

12  sue in their own right; (b) the interests it seeks to protect are

13  germane to the organization's purposes; and (c) neither the claim

14  asserted nor the relief requested requires the participation of

15  individual members in the lawsuit."  Ecological Rights Found. v.

16  Pac. Lumber Co., 230 F.3d 1141, 1147 (9th Cir. 2000) (citations

17  omitted).  To establish Article III standing, "a plaintiff must

18  show (1) it has suffered an "injury in fact" that is (a) concrete

19  and particularized and (b) actual or imminent, not conjectural or

20  hypothetical; (2) the injury is fairly traceable to the

21  challenged action of the defendant; and (3) it is likely, as

22  opposed to merely speculative, that the injury will be redressed

23  by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw

24  Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).

25      The parties here dispute whether Plaintiff's individual

26  members would otherwise have standing to sue in their own right,

27  in particular, whether Plaintiff has sufficiently alleged a

28  concrete injury in fact.  An individual can "adequately allege

8

injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." <u>Friends of the Earth, Inc.</u>, 528 U.S. at 183 (quoting <u>Sierra Club v. Morton</u>, 405 U.S. 727, 735 (1972)).  Injury in fact may be established by alleging geographic proximity and extensive use of a particular area.  <u>See</u> <u>White Tanks Concerned Citizens, Inc. v. Strock</u>, 563 F.3d 1033, 1039 (9th Cir. 2009) (holding that living near the area in question and regularly using the area is a "'tangible, continuing connection to . . . [the] particular location' that is required for standing") (quoting <u>Ecological Rights Found.</u>, 230 F.3d at 1147).  In <u>Summers v. Earth Island Institute</u>, the Supreme Court held that the plaintiffs did not have standing because plaintiffs' individual members' vague desire to return to the geographical area without concrete plans was "insufficient to satisfy the requirement of imminent injury." <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 495-96 (2009).

   To establish injury here, Plaintiff has offered the declarations of Priscilla Feral ("Feral") (Doc. #25-2) and Larry Glass ("Glass") (Doc. #25-1).

          a.   <u>Priscilla Feral</u>

   Feral avers that Plaintiff's "members visit and recreate in and around the areas where the proposed experiment will occur," and they "also receive considerable pleasure from the beauty, sanctity, peacefulness of these areas principally because the areas are free from human manipulation of wildlife."  Feral Decl. ¶ 11.  These statements do not demonstrate a concrete injury in fact because they are general, no individual members are named,

1    and no concrete plans to return to the geographical area are

2    identified.   Moreover, during the July 9, 2014 hearing, Plaintiff

3    stated that the Feral declaration was not provided to support

4    standing but to inform the Court about the organization.

5    Therefore, Feral's declaration does not constitute evidentiary

6    support for Plaintiff's standing argument.

7                        b.   <u>Larry Glass</u>

8         In his declaration, Glass states that he became a member of

9    Plaintiff's organization in September 2013.   Glass Decl. ¶ 2.   He

10   also declares, "I have regularly visited the National Forest in

11   Willow Creek areas since 1971.   I also have plans to visit this

12   area this summer (2014) to document for both Friends of Animals

13   and Conservation Congress any impacts to the forest and owl

14   habitat associated with barred owl removal that occurred in the

15   fall and winter."   Glass Decl.

16   ¶ 12.   Although Glass has concrete plans to visit Willow Creek,

17   BOs will not be removed from Willow Creek because it is the

18   control area.   As described in the FEIS:

19        The Hoopa (Willow Creek) Study Area represents the
          southernmost portions of the Klamath Province, and has
20        a long history of well-documented demographic data for
          the spotted owl.   While barred owl populations are
21        relatively lower than in areas where the invasion has
          a longer history, this area has seen a rapid increase
22        in number of barred owls, and potential impacts on
          spotted owls, in recent years.   The experiment would
23        involve treatment (removal) on the Hoopa Spotted Owl
          Demography Study Area paired with experimental control
24        (non-removal) on the Willow Creek Spotted Owl
          Demography Study Area.
25

26   Administrative Record ("AR") at 161.   In addition, the Hoopa area

27   is a reservation with an ordinance prohibiting trespass.   <u>See</u>

28   Fed. Defs.' Ex. 1, Hoopa Valley Tribe, Ordinance No. 4-96.

In the surreply, Plaintiff argues that even though BOs will not be removed from Willow Creek, the area is nevertheless affected.  First, Plaintiff claims that the removal of owls is not the sole cause of Glass' injury because the entire plan affects Glass' enjoyment of the area.  In particular, Plaintiff argues that Glass' interests are impaired by the government's use of the area as the control portion of the study because monitoring occurs in the control area.  As a threshold matter, this argument is not supported by Glass' declaration because he only makes vague statements about the plan affecting his interests, but he makes no specific reference to the monitoring impairing his enjoyment of the area.  Moreover, Glass' "aesthetic, spiritual, and recreational interests" are not impaired by monitoring because observing and recording information does not alter the area.  At most, Glass "<u>feels</u> his enjoyment of the area is diminished" by the monitoring but there is no concrete injury.  Surreply at 2 (emphasis added).  Finally, as Defendants argued during the hearing, monitoring of the area has been occurring in Willow Creek since 1985 and therefore, the plan does not change the status quo.  Plaintiff argues that the status quo was upset when the purpose of the monitoring was changed to the taking of BOs, which diminishes Mr. Glass' enjoyment of the area.  Even though the purpose of the monitoring has changed, there is no concrete injury because Glass' ability to view the owls and their habitat in Willow Creek is not affected by changing the purpose of the monitoring.  Therefore, the Court finds Glass has not suffered an injury from the monitoring of Willow Creek.

1    Second, Plaintiff argues that BO removal in the Hoopa area

2    might affect the entire study area, which includes Willow Creek.

3    Based on a BO's home range and a juvenile BO's 50-mile travel

4    path, Plaintiff claims that "it is anticipated that any BO that

5    enters the Hoopa reservation—not just those that nest there—might

6    be killed." Surreply at 3. Defendants argued during the hearing

7    that only owls in the Hoopa area or within five miles would be

8    affected; moreover, it would be counterproductive for the

9    scientific study if the owls in the control area were also

10   affected. On this issue, the FEIS provides as follows:

11         We expect substantial reduction of the barred owl
           population in the treatment (removal portion) of each
12         study area, but little effect in the surrounding
           landscape. Some local floaters near the treatment
13         area may move into and recolonize sites in the
           treatment area, temporarily reducing the floater
14         population near the treatment area. We do not
           anticipate affecting floaters more than 5 miles from
15         the treatment area, and floaters that do move are
           likely to be replaced by dispersing juvenile and
16         subadult barred owls. We do not expect territorial
           barred owls to abandon their territories to move into
17         the treatment area; therefore, we do not anticipate
           substantial changes in the territorial barred owl
18         population near the treatment area.

19   AR at 256. Plaintiff disagrees with this argument because the

20   FEIS also states that "no data exists to allow us to calculate

21   the scale and scope of this effect." Id. However, that

22   statement is in reference to the areas immediately adjacent to

23   the affected area, not the areas farther away or the control

24   area. Id.

25        Third, Plaintiff argues that it does not matter that the BO

26   taking will occur in private or inaccessible lands, citing

27   Cantrell v. City of Long Beach, 241 F.3d 674 (9th Cir. 2001), and

28   Soda Mountain Wilderness Council v. Norton, 424 F. Supp. 2d 1241

                                   12

1   (E.D. Cal. 2006).  In Cantrell, the court held that the

2   plaintiffs had established a concrete interest in viewing the

3   birds and the natural environment at the Naval Station even

4   though they were not authorized to access the Naval Station

5   because the plaintiffs conducted regular visits from areas

6   outside and adjacent to the Naval Station after it was closed to

7   the public and had specific plans to visit the areas around the

8   station in the future.  Id. at 680.  Similarly, in Soda Mountain,

9   the court held that the plaintiffs had standing despite the

10   plaintiffs' lack of a right to access the private land because

11   several plaintiffs avered that they traveled to the edge of the

12   public land and there was evidence that the adjacent public land

13   would be affected.  424 F. Supp. 2d at 1256.  In this case,

14   however, Glass is not visiting an outside and adjacent location

15   of the affected area, but an area more than five miles away,

16   which as mentioned above will not be affected.  See Cox v. Office

17   of Fed. Det. Tr., CV. 09-01409 DAE, 2010 WL 4934842, *6 (D. Nev.

18   Nov. 30, 2010) (noting that the plaintiffs case was

19   distinguishable from Cantrell because "the plaintiffs in Cantrell

20   were birdwatching at the actual affected site and Plaintiffs here

21   conduct their activities in 'nearby national forests'").

22        Finally, Plaintiff argues that Defendants' reliance on Lujan

23   v. National Wildlife Federation, 497 U.S. 871 (1990), is to no

24   avail.  To clarify, Defendants directly rely on Lujan v.

25   Defenders of Wildlife, 504 U.S. 555, 565-66 (1992), not Lujan v.

26   National Wildlife Federation.  Nevertheless, Defenders of

27   Wildlife relies on National Wildlife Federation.  In Defenders of

28   Wildlife, the Supreme Court rejected the "ecosystem nexus"

1   theory, which "proposes that any person who uses *any part* of a

2   'contiguous ecosystem' adversely affected by a funded activity

3   has standing even if the activity is located a great distance

4   away" because "a plaintiff claiming injury from environmental

5   damage must use the area affected by the challenged activity and

6   not an area roughly 'in the vicinity' of it."  504 U.S. at 565-66

7   (emphasis in original) (citing National Wildlife Federation, 497

8   U.S. at 887-889).  In this case, Plaintiff's argument is a form

9   of the ecosystem nexus theory rejected by the Supreme Court.

10  Therefore, Defenders of Wildlife is persuasive and controlling

11  authority.

12      Glass has not avered that he has any concrete plans to visit

13  an area that will be affected by the conduct that impairs his

14  interests or an adjacent area.  Accordingly, because neither

15  Feral nor Glass has established an injury, Plaintiff has failed

16  to demonstrate that an individual member has standing.

17              2.   Independent Standing

18      An organization suing on its own behalf can establish an

19  injury when it suffers "both a diversion of its resources and a

20  frustration of its mission."  Fair Hous. of Marin v. Combs, 285

21  F.3d 899, 905 (9th Cir. 2002).  In this case, Feral declares that

22  she is the president of Friends of Animals, whose "mission is to

23  cultivate a respectful view of nonhuman animal, and to end human

24  exploitation and manipulation of wildlife."  Feral Decl. ¶ 2.

25  Any manipulation of wildlife, such as taking owls, would

26  therefore be considered a frustration of Plaintiff's mission.

27  However, there is no evidence that the organization will suffer a

28  diversion of its resources.  At most, Feral states that

14

1  Defendants' decision negatively affects the organization's
2  interests in several ways, such as limiting the organization's
3  ability to disseminate accurate and up-to-date scientific
4  information and inhibits its fundraising.  Id. ¶ 13.  These
5  statements are insufficient.  An organization must "show that it
6  would have suffered some other injury if it had not diverted
7  resources to counteracting the problem."  La Asociacion de
8  Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d
9  1083, 1088 (9th Cir. 2010).
10     Therefore, the Court finds that Plaintiff does not have
11  independent standing to bring this action.
12
13                    III.   ORDER
14     For the reasons set forth above, the Court GRANTS
15  Defendants' Cross-Motion for Summary Judgment for lack of
16  standing and DENIES WITHOUT PREJUDICE Plaintiff's Motion for
17  Summary Judgment.  See Frigard v. United States, 862 F.2d 201,
18  204 (9th Cir. 1988) ("Ordinarily, a case dismissed for lack of
19  subject matter jurisdiction should be dismissed without prejudice
20  so that a plaintiff may reassert [its] claims in a competent
21  court.")
22     IT IS SO ORDERED.
23  Dated: July 31, 2014

                                    _____
                                    JOHN A. MENDEZ,
                                    UNITED STATES DISTRICT JUDGE

24
25
26
27
28